UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA      )
                              )
            v.                )  CRIMINAL ACTION NO. 05-10295-PBS
                              )
MAXIMANO SILVA and            )
CRYSTAL SILVA,                )
          Defendants.         )
                              )
```

**MEMORANDUM AND ORDER**

February 26, 2007

Saris, U.S.D.J.

**INTRODUCTION**

Defendant Maximano Silva moves to suppress evidence of identity fraud seized pursuant to a search warrant.  He argues that the warrant was based on evidence illegally seized by defendant's brother who was allegedly acting as a government agent during two searches of defendant's bedroom.  After hearing, the Court **DENIES** the motion.

**FINDINGS OF FACT**

**1.  The Theft of the Wallet**

In December 1999, John D'Angelo, a resident of Marlborough, Massachusetts, reported the theft of his wallet by a female hitchhiker to the Hudson Police Department.  Later, in March of 2000, D'Angelo reported to the Hudson Police that someone had opened a cell phone account in his name and that copies of the bills were being sent to 22 High Street in Hudson.  Detective

Charles Devlin took the report.  He had been at this address multiple times and knew the fractious inhabitants, including defendant, who had a prior conviction for larceny.  Devlin had encountered defendant twenty times over the space of ten or more years, including four times the previous year, and believed Max to be a trouble-maker.

22 High Street is a two-family residence that was converted into a single family home.  Everyone living at 22 High Street is related.  The defendant lived on the first floor where he shared a bedroom with his wife, Crystal, and infant child.  Defendant's mother and stepfather also lived on the first floor.  The defendant's brother Norman lived on the second floor with a stepsister and another relative.

Detective Devlin determined that a cell phone associated with the account in D'Angelo's name had been shipped to 22 High Street.  On March 7, 2000, Devlin placed a call to that number.  A male voice answered.  Devlin knew it was not D'Angelo and suspected, but wasn't sure, that it was the defendant, Max Silva.  He asked, "Is Max there?" and the person replied, "There is no Max here."  When Devlin asked what the person's name was, he answered "John" but refused to give his last name before hanging up.  Devlin had spoken to Max many times over the years and thought he recognized Max's voice on the phone.

## 2.   The First Entry

On May 9, 2000, Norman Silva, defendant's brother, went to the Hudson Police Department concerned that he was a victim of identity theft.  He spoke with Detective Devlin.  Norman said that he learned from a friend, Christina Monteiro, that Max had used his identity during one or more traffic stops, and that speeding tickets had been issued in his name.  Norman explained to Devlin that he had gone into Max's bedroom and found the tickets.  Further, he told Devlin that he was receiving medical bills for treatment he had not received and believed that his brother Max was using his identity.

He also said that while searching Max's room he had seen a driver's license and cell phone bill in someone else's name with an address in Marlborough.  Moreover, he said that Max had talked about receiving a phone call regarding his cell phone and had gotten rid of it because he believed the call was from the police.  Norman did not bring any of the items discovered in Max's room to the police station.  Devlin explained that he couldn't do anything to help Norman without the documents.

## 3.   The Second Search

That same day, Norman returned to 22 High Street, entered Max's bedroom again, and procured at least one speeding ticket. He brought the speeding ticket and medical bills to Devlin later that afternoon, but did not bring the cell phone bill or driver's

license.  When Detective Devlin asked Norman where the missing
documents were, he replied "at home".  Devlin instructed him to
bring the other documents so that he could get a search warrant.

## 4. The Third Search

Norman went back into Max's bedroom a third time and
obtained the missing documents.  On May 10, he provided Devlin
with photocopies[1] of John D'Angelo's Massachusetts driver's
license and a Bell Atlantic Notice of Discontinuance for a cell
phone addressed to 22 High Street.  Norman told Devlin that he
had found the documents in Max's bedroom under the mattress.
Norman did not have permission from Max to retrieve any
documents; however, the door to his bedroom was unlocked.

Detective Devlin investigated Norman's claim that the
tickets had been erroneously issued in his name.  He contacted
two police officers who had issued tickets to a person who
identified himself as Norman.  When Devlin showed the officers
photographs of Norman and Max, both informed Devlin that the
person they had issued the tickets to was Max.  On May 31, Devlin
obtained a search warrant for 22 High Street where evidence of
identity fraud was found.

---

[1] The record is unclear as to whether Norman or Devlin
photocopied the documents, and when the photocopies were made.

**DISCUSSION**

1.   **The Searches**

Defendant argues that the search warrant was based on improperly seized evidence because Norman was acting as a government agent when he entered his brother Max's bedroom and took the documents.

The Fourth Amendment protection against unreasonable searches and seizures does not apply to searches by a private citizen unless he was acting as a government agent when conducting the search.  See Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 614 (1989) ("Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." (citation omitted)). Furthermore, a private search or seizure "does not deprive the government of the right to use evidence that it has acquired lawfully."  Walter v. United States, 447 U.S. 649, 656 (1980).

The First Circuit has set forth various factors which should be considered in determining whether a private citizen was acting as a government agent, including:

   1.   the extent of the government's role in instigating
        or participating in the search;

   2.   its intent and the degree of control it exercises
        over the search and the private party; and

5

3. the extent to which the private party aims primarily to help the government or to serve its own interests.

United States v. Pervaz, 118 F.3d 1, 6 (1st Cir. 1997)

(declining, however, to adopt a specific standard or test).

Incidental contact with law enforcement agents is not sufficient

to subject a private search to Fourth Amendment protections.  See

United States v. Walther, 652 F.2d 788, 791 (9th Cir. 1981)

("[D]e minimis or incidental contacts between the citizen and law

enforcement agents prior to or during the course of a search or

seizure will not subject the search to fourth amendment scrutiny.

The government must be involved either directly as a participant

or indirectly as an encourager of the private citizen's actions

before we deem the citizen to be an instrument of the state.")

When a search begins as a private search and morphs into a

governmental search, "the critical issue is the point in time

when the object of the search has been completed."  United States

v. Knoll, 16 F.3d 1313, 1320 (2d Cir. 1994).  The government

cannot become a party to a private search once the object of the

search has been accomplished, but law enforcement also "may not

expand the scope of an ongoing private search unless it has an

independent right to do so."  Id. (remanding case for additional

fact-finding where burglars turned over to the government

evidence of a crime obtained without government involvement, but

the government subsequently instructed them to go back through

the burgled files to look for additional evidence, because a
"private party acting as a government agent also may not expand
upon a previously private search without running afoul of the
Fourth Amendment").

   With this caselaw in mind, I address the three searches.
Norman's initial search of Max's bedroom <u>before</u> his contact with
Detective Devlin was wholly private and not subject to the Fourth
Amendment.  <u>See</u> <u>United States v. Mendez-de-Jesus</u>, 85 F.3d 1, 2-3
(1st Cir. 1996) (holding that when two private citizens brought
suspected illegal immigrants to a police station, the seizure was
not subject to the Fourth Amendment because there was "no
suggestion that the government initiated or participated in the
citizen action"); <u>United States v. Coleman</u>, 628 F.2d 961, 965-66
(6th Cir. 1980) (where a private party repossessing the
defendant's vehicle voluntarily and on his own initiative turned
over to local police the defendant's personal effects found in
the car, including drug and gun evidence, the private party was
not acting as a government agent).

   The second foray into the bedroom occurred immediately <u>after</u>
Norman's initial meeting with Devlin.  This search yielded the
citations and medical bills in Norman's name that were found in
Max's room.  Because Norman retrieved these documents to show
theft of his own identity, Norman's primary aim in surrendering
these items to Detective Devlin was to serve his own interests,

not those of the government.  The government instigated the search only in the sense that Devlin said he couldn't help him without the documents.  Moreover, Devlin exercised no control over how the search was conducted.  Thus, this search was not covered by the Fourth Amendment.

The third bedroom entry, however, is a much closer call. When Norman presented the speeding citations and medical bills, Detective Devlin pressed Norman to get the items he had seen in other people's names, including the driver's license and the telephone bill in someone else's name.  Although Devlin did not expressly tell him to re-enter the bedroom, that was the foreseeable result of the instruction.  In this re-entry, Norman's primary aim was to comply with Devlin's instructions, not to promote his own interests.  The defendant contends that Norman became a government agent because Devlin instructed him to conduct this additional search.

The government insists that this was not a government search because Devlin did not actively participate in the search or direct it in any way.  See, e.g., United States v. Reed, 15 F.3d 928, 932-33 (9th Cir. 1994) (holding that police officers watching hotel manager's search of defendant's suitcases and drawers in hotel room while manager called out drug evidence as he discovered it was a warrantless government search).

While Devlin did not micromanage the search, I find that Devlin's direct instruction to Norman to return a third time with the goal of proving an ongoing identity theft investigation rendered Norman a government agent for purposes of the third search only.  When Norman re-entered as a government agent to seize the evidence, the government exceeded the scope of the private search.  Cf. United States v. Runyan, 275 F.3d 449, 462 (5th Cir. 2001) (finding Fourth Amendment violation where police officers exceeded the scope of private search by examining the contents of an entire collection of computer disks turned over by the private searchers for evidence of child pornography, rather than confining their search to the selected disks examined by the private searchers).

## 2.   Privacy

The next question the court must answer is whether Max had a legitimate privacy interest in his bedroom at 22 High Street. Normally, of course, a person has a legitimate expectation of privacy in his own bedroom protected by the Fourth Amendment. Thus, to the extent a private person acting as a government agent enters to conduct a warrantless search, the search is invalid. The complicating factor here is that the "government agent" is the defendant's brother who lived in the same home with defendant.

At the time of his searches of Max's bedroom, all residents of 22 High Street were related to each other by blood or marriage.  Max lived in his room with his wife and child.  The door was typically unlocked.  Significantly, Norman said he had never been in Max's bedroom when Max was not present.  However, Norman also acknowledged that, if Max was not in his room, he could walk into Max's room and borrow something (like socks).  Although Max could do the same in Norman's room, Norman did acknowledge that neither of them would tolerate the other "rifling through" the other's room without permission.

Based on these facts, the government argues that Norman, as the brother, had the authority to consent to his search as a government agent.  It asserts that Norman would be filling two roles: one as a resident of the home with authority to consent to the search, and one as an agent of the police to conduct the search after having consented to it.

A co-tenant of a dwelling may grant consent to search if he or she has common authority over the property when the suspect is not present to refuse consent.  <u>Georgia v. Randolph</u>, __ U.S. __, 126 S. Ct. 1515, 1520 (2006) (holding, however, that a warrantless search of a shared dwelling over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given by another resident).  The exception for consent "extends even to entries

10

and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)).  Common authority is defined by whether there is "mutual use of the property by persons generally having joint access or control for most purposes." United States v. Matlock, 415 U.S. 164, 171 n.7 (1974).  A co-tenant may not consent to a search of another co-tenant's space unless the co-tenant giving consent has some shared dominion over that space. Contrast United States v. Heisman, 503 F.2d 1284, 1288-89 (8th Cir. 1974) (holding that co-tenant did not have authority to consent to search of other co-tenant's private office to which he "normally" did not have permission to enter), with United States v. Kelley, 953 F.2d 562, 566 (9th Cir. 1992) (upholding validity of search consented to by co-tenant because the only telephone was in the suspect's bedroom).

More on point, courts have also addressed the authority of a family member to consent to searches of the rooms of other adult members.  In United States v. Clutter, 914 F.2d 775, 777 (6th Cir. 1990), for example, the Sixth Circuit held that "mature family members" may consent to a police search of their entire home because "in common experience family members have the run of the house."  This common authority, however, would not extend to areas where a family member manifests an expectation of privacy

11

by excluding other members from that area.  See id. at 777-78.
Other courts have held that a parent's consent to a search of an
adult child's bedroom is valid.  United States v. Rith, 164 F.3d
1323, 1331 (10th Cir. 1999) (holding that, although there was
insufficient proof that parents had joint access to their 18-
year-old son's bedroom, because the son did not pay rent, the
parents had "sufficient control for most purposes . . . over the
entire home" to consent to search of his room); United States v.
Robinson, 999 F. Supp. 155, 159-60 (D. Mass. 1998) (holding that,
in the absence of proof of joint access and use or a rebuttal by
defendant proving exclusive use, the parent-child relationship
weighed in favor of authority to consent).

     The question is whether Norman, an adult sibling living in
one home with his brother, functions more like a co-tenant or a
parent.  There is no evidence that Norman pays rent for Max's
space or that he had the "run of the house."  The government has
not demonstrated that Norman had sufficient access, control, or
authority over his brother's bedroom to consent to the search of
the room or to rummage under the mattress for the documents.  I
add that there is no evidence of bad faith on the part of Officer
Devlin, who had experience with the residence and knew both
brothers lived in the same house and could in good faith have
believed Norman had actual or apparent authority to enter the
bedroom to retrieve the documents.  (There is no evidence Devlin

knew the documents were under a mattress at the time of the third search.)  Accordingly, I conclude that the third search violated the Fourth Amendment.[2]

### 3.  The Validity of the Search Warrant

Even though the search is invalid, the government argues that Devlin received sufficient information from Norman's initial two visits to establish probable cause for a search warrant.  See Murray v. United States, 487 U.S. 533, 537-38 (1988) (describing independent source rule); Runyan, 275 F.3d at 466-67 (same). When a court reviews a warrant "containing information obtained pursuant to an illegal search," it must excise that information and determine whether the remaining information establishes probable cause and whether the police would have pursued the warrant absent the illegal information.  United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005).  In answering the second question, the court is not bound by the subjective, post hoc assurances of the officer's intent, but rather "must assess the totality of the attendant circumstances to ascertain whether those assurances appear 'implausible.'"  Id. at 369 (quoting Murray, 487 U.S. at 540 n.2).

---

[2]Arguably, Devlin's reasonable belief that Norman had authority ends the inquiry under Rodriguez, 497 U.S. at 186. However, the government does not brief the point, and Devlin did not testify about his belief as to Norman's authority to re-enter.  Indeed, Devlin's main point was that Devlin did not tell him he had to re-enter.  I am reluctant to rest on this point.

Even after excising the hard copies of the license and phone bill that Norman seized as a government agent in his third search, I find that the affidavit established probable cause for the search warrant.  The affidavit identifies several sources of information independent of the excised materials that give rise to probable cause, including: (1) John D'Angelo's statement that an account was opened in his name and that bills were being sent to defendant's address; (2) Devlin's suspicion that the person who answered the cell phone associated with the account in D'Angelo's name was Max Silva; (3) Norman's statement that Max had talked about receiving a phone call from someone he believed to be a police officer, and canceled his account the next day; (4) Norman's statement that he saw a license and cell phone bill belonging to someone else with a Marlborough address; (5) the traffic citations and medical bills provided by Norman; and (6) the confirmation by two police officers that Max had used Norman's name during traffic stops.

In light of all this information, I find that Devlin would have applied for a search warrant even if Norman had not re-entered the bedroom a third time to retrieve the documents.

**ORDER**

This Court **DENIES** the motion to suppress.

14

 /s/ Patti B. Saris
PATTI B. SARIS
United States District Judge